# EXHIBIT B

**Liquidation Analysis**

# HYPOTHETICAL LIQUIDATION ANALYSIS
# FOR PROSPECT MEDICAL HOLDINGS, INC., et al.

THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE. THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.

THE DEBTORS HAVE SOUGHT TO PROVIDE A GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE AVAILABLE IN A HYPOTHETICAL CHAPTER 7 LIQUIDATION. HOWEVER, THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Key Assumptions and Global Notes Underlying the Hypothetical Liquidation**

The following general assumptions were considered by the Debtors and their advisors as assumptions that would be applicable in any hypothetical chapter 7 liquidation (a "**Chapter 7 Liquidation Scenario**").

Based on the foregoing, and the Key Assumptions and Global Notes below, the Debtors believe the following Liquidation Analysis (as defined below) reflects the likely results of a chapter 7 liquidation as compared to an orderly wind-down of the Debtors' Estates (as defined under the Plan) pursuant to a liquidating chapter 11 plan.

1. Introduction

The Debtors, with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the *Joint Chapter 11 Plan of Prospect Medical Holdings, Inc. and its Debtor Affiliates* [Docket No. 2986] (as amended, supplemented, or modified from time to time, the "**Plan**") and the *Disclosure Statement for the Joint Chapter 11 Plan of Prospect Medical Holdings, Inc. and its*

*Debtor Affiliates* [Docket No. 2987] (as amended, supplemented, or modified from time to time, the "**Disclosure Statement**"). [1] This Liquidation Analysis indicates the estimated recoveries that may be obtained by holders of Claims and Interests in a hypothetical Chapter 7 Liquidation Scenario pursuant to chapter 7 of the Bankruptcy Code, as an alternative to the Plan.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Interest in each Impaired Class: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To demonstrate compliance with section 1129(a)(7), this Liquidation Analysis: (1) estimates the cash proceeds (the "**Liquidation Proceeds**") that a chapter 7 trustee (the "**Trustee**") would generate if each of these chapter 11 cases were converted to a chapter 7 case and the assets of each Debtor's Estates were liquidated; (2) determines the distribution (the "**Liquidation Distribution**") that each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compares each holder's Liquidation Distribution to the distribution under the Plan that such holder is projected to receive if the Plan were confirmed and consummated. Accordingly, the asset values discussed herein may be different than amounts referred to in the Plan. This Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement.

2. **Basis of Presentation**

On January 11, 2025 (the "**HCo Petition Date**"), Prospect Medical Holdings, Inc. ("**PMH**") and its current hospital-related debtor affiliates, as debtors and debtors in possession (collectively, the "**HCo Debtors**"), commenced voluntary cases under chapter 11 of title 11, United States Code, §§ 101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Texas (the "**Court**"). On July 7, 2025, PHP Holdings, LLC ("**PHPH**") and its physician-related debtor affiliates (collectively, the "**PCo Debtors**," and together with the HCo Debtors, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the Bankruptcy Code in the Court. On July 9, 2025, the Court entered the *Order (I) Directing the Joint Administration of the PCo Debtors' Chapter 11 Cases with the HCo Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 2473]. The Liquidation Analysis was prepared on a legal entity basis for each Debtor and summarized into a consolidated report for ease of presentation. In the event that the Debtors were to be liquidated in separately administered chapter 7 cases, the administrative costs to the Debtors in each of the cases, including professional fees, Trustee fees, and operational costs likely would be higher than if the cases were consolidated.

This Liquidation Analysis has been prepared assuming that the Debtors would convert their cases from chapter 11 cases to chapter 7 cases on or around October 1, 2025 (the "Conversion Date") and would be liquidated thereafter pursuant to chapter 7 of the Bankruptcy Code. The Effective Date of a Plan is anticipated to occur on or around October 31, 2025.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan and Disclosure Statement.

The pro forma distributable values referenced herein are projected to be as of October 1, 2025 (with certain adjustments, including those that represent like-for-like comparability to the Disclosure Statement recovery analysis), and those values are assumed to be representative of the Debtors' assets as of the Conversion Date. This Liquidation Analysis is summarized in the table contained herein.

This Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation of the Debtors. It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint a Trustee who would sell the remaining assets of the Debtors as soon as possible following the Conversion Date and distribute the cash proceeds, net of liquidation-related costs, to holders of Claims and Interests in accordance with the priority scheme set forth in chapter 7. The wind-down of the Debtors' Estates is assumed to occur over a six-month period (the "**Wind-Down Period**"). It is assumed that the Trustee will retain lawyers and other necessary advisors to assist in the liquidation and wind-down of the Debtors' Estates.

The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by the Debtors' managing officers ("**Management**") and the Debtors' advisors, are inherently subject to significant business, economic, and market uncertainties and contingencies beyond the Debtors' control.

In preparing this Liquidation Analysis, the Debtors have estimated an amount of Allowed Claims for each Class of claimants based upon a review of the Debtors' books and records as of May 31, 2025 and filed claims as of August 13, 2025, adjusted for estimated balances as of the Conversion Date where applicable. The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

Professional fees,[2] Trustee fees, Administrative and Priority Claims, and other such Claims that may arise in a liquidation scenario would have to be fully paid from the Liquidation Proceeds before any proceeds are made available to holders of General Unsecured Claims at each respective Debtor. Under the priority scheme dictated in chapter 7, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the priority scheme dictated in chapter 7 and adjusted in accordance with the *Order (A) Approving Settlement with MPT and Junior DIP and (B) Granting Related Relief* [Docket No. 1287] (the "9019 Settlement Order") approving the terms of the global settlement between the Debtors and Medical Properties Trust, Inc. (together with its affiliates and subsidiaries, "**MPT**") as set forth in the *Settlement and Support Agreement* (the "**9019 Settlement Agreement**").

---

[2] Actual professional fees may differ from the currently contemplated budget based on any number of factors, including the extent and complexity of claims objections and unanticipated litigation. Any variance to estimated professional fees are expected to be the same in both the chapter 11 and chapter 7 scenarios.

3

This Liquidation Analysis does not include comprehensive estimates for the tax consequences that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material.

3. **Liquidation Process**

For purposes of this analysis, the Debtors' hypothetical Chapter 7 Liquidation Scenario would be conducted in a chapter 7 environment with the Trustee managing the bankruptcy estate of each Debtor to maximize recoveries in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of assets for distribution to creditors. The major components of the liquidation and distribution process are as follows:

- generation of cash proceeds from remaining assets including the wind-down of the California and Connecticut operations;
- reconciliation of claims;
- payment of costs related to the liquidation process, such as estate wind-down costs and Trustee, professional, broker, and other administrative fees; and
- distribution of net proceeds generated from asset sales to the holders of Allowed Claims and Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code and in accordance with the Recovery Waterfall (See Paragraph 4 below regarding treatment under the 9019 Settlement Agreement).

4. **Impact of 9019 Settlement Agreement**

The Debtors engaged in extensive arm's-length negotiations with MPT, the UCC and other creditors that resulted in the *Motion of the Debtors Pursuant to Bankruptcy Rule 9019 for Approval of Settlement with MPT [Docket No. 769]* (the "**9019 Motion**") and ultimately the 9019 Settlement Order, approving the 9019 Settlement Agreement. The Liquidation Analysis waterfall is consistent with the Recovery Waterfall as defined and reflected in the 9019 Settlement Agreement, which dictates "the Global Settlement (including, without limitation, the Junior DIP) shall become enforceable and binding on all parties in interest, **including, without limitation**, the Creditors' Committee, **any subsequently appointed chapter 11 or chapter 7 trustee**, and any other estate representative, each in accordance with the terms thereof." *(emphasis added).*

5. **Timing Considerations of Chapter 7 Cases**

The Liquidation Analysis assumes an orderly wind-down and liquidation of any remaining operations or assets over a six-month period commencing on or around the Conversion Date. There can be no assurance, however, that a liquidation would be completed in the limited timeframe, nor is there any assurance that the recoveries assigned to the Debtors' assets would in fact be realized. Further, during these chapter 11 cases, the substantial majority of the Debtors' assets were being actively marketed for each region (California, Connecticut and Pennsylvania) and the Debtors' Rhode Island assets were subject to a prepetition asset purchase agreement. The sales processes

are in various stages of completion as of the Conversion Date and we have assumed outcomes on a regional basis for each depending upon how advanced they are in the sale process.

- Pennsylvania wind-down commenced in April 2025, and the wind-down is largely complete. However, the Debtors expect continued wind-down activities through August 2025.
    - The Pennsylvania ASC/Imaging Sites Transaction closed on August 1, 2025.
    - Equipment liquidation sales are expected to be completed prior to the Conversion Date.
    - The sales and/or abandonment of certain Pennsylvania hospitals and real property (the "**Burdensome Property**") are estimated to be completed prior to the Conversion Date.

- The Rhode Island sale transactions are expected to be complete prior to the Conversion Date:
    - The Rhode Island PhysicianCo Sale Transaction closed on July 2, 2025.
    - The Rhode Island HospitalCo Sale Transaction is expected to be completed prior to the Conversion Date.

- If the California Sale Transaction, Connecticut ECHN Sale Transaction, and Connecticut Waterbury Sale Transaction are not completed in advance of the Conversion Date, the Debtors' hospitals in these regions would stop admitting patients and pivot to a wind-down of operations.
    - For purposes of this analysis, the Debtors assume that there are no regulatory issues with an immediate pivot to wind-down. However, it is likely that, in a wind-down scenario, the Debtors would be forced to meet regulatory requirements that may delay the ultimate timeline for a wind-down.

6. **Additional Claims**

The cessation of the Debtors' businesses in a Chapter 7 Liquidation Scenario is likely to trigger certain claims and costs that otherwise would not exist under the Plan. Examples of these kinds of claims include tax liabilities triggered upon the transfer of assets, increased costs related to the abrupt wind-down of the operations in California and Connecticut and the associated estate wind-down, and litigation Claims. While some of these Claims could be significant and may be entitled to priority in payment over General Unsecured Claims, no adjustment has been made for these potential Claims unless specified in the assumptions and notes to the Liquidation Analysis and chapter 11 plan analysis.

7. **Distribution of Net Proceeds to Claimants**

Chapter 7 and chapter 11 Administrative Claims, Professional Compensation Claims, Priority Tax Claims, Statutory Fees, and other Claims that may arise in a Chapter 7 Liquidation Scenario would be paid from the liquidation / wind-down proceeds before the balance of any proceeds will be made available to make distributions on account of Allowed Claims or Allowed Interests. Under the absolute priority rule, no junior creditor at a given entity would receive any

distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. However, the assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule and adjusted in accordance with the 9019 Settlement Order.

**Conclusion - Consummation of the Plan Will Provide Greater Value Than Under a Hypothetical Liquidation Through Chapter 7 of the Bankruptcy Code.**

The Debtors have determined on a legal entity basis, and as summarized in the following table, that upon the Effective Date, the Plan will provide all holders of Claims and Interests with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Accordingly, the Debtors believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.[3]

---

[3] This Liquidation Analysis was prepared on a legal-entity basis by the Debtors' Management and advisors. The estimated liquidation recovery assumes that the Debtors would be liquidated in jointly administered chapter 7 cases but on a non-consolidated basis.

# Chapter 11 Plan Analysis Compared to Chapter 7 Liquidation Analysis

The exhibit below provides a side-by-side comparison of the respective recoveries for various Classes of Claims and Interests under the Chapter 11 Plan Analysis and Chapter 7 Liquidation Scenario on a consolidated basis.

*$ in MM*
**Consolidated**

| | | Liquidation Scenario | | Plan Scenario | | |
|---|---|---|---|---|---|---|
| Class | Claim/Equity Interest | Projected Claims | Projected Recovery Base | Projected Claims | Projected Recovery Base | Pass/Fail |
| N/A | DIP Claims | $ 313.7 | 0.9% | $ 327.0 | 100.0% | PASS |
| N/A | Admin Claims & Priority Tax Claims | 56.0 | 0.0% | 50.1 | 100.0% | PASS |
| Class 1 | Other Secured Claims | 192.5 | 0.0% | 199.2 | 20.2% | PASS |
| Class 2 | Other Priority Claims | 2.5 | 0.0% | 2.5 | 0.0% | PASS |
| Class 3 | MPT Agreed Claims | 1,146.2 | 0.0% | 1,150.3 | 8.5% | PASS |
| Class 4 | MPT Note Claims | 755.4 | 0.4% | 755.4 | 0.5% | PASS |
| Class 5 | PhysicianCo Subordinated Secured Note Claims | 15.0 | 0.0% | 15.0 | 0.0% | PASS |
| Class 6 | PBGC Secured Claim | - | N/A | - | N/A | PASS |
| Class 7 | Insured Claims [1] | 1,283.1 | 0.0% | 1,283.1 | TBD | PASS |
| Class 8 | General Unsecured Claims [2] | 3,767.2 | 0.0% | 3,767.2 | TBD | PASS |
| Class 9 | Section 510(b) Claims | - | N/A | - | N/A | PASS |
| Class 10 | Intercompany Claims | 5,603.8 | 0.0% | 5,603.8 | 0.0% | PASS |
| Class 11 | Equisting Equity Interests | - | N/A | - | N/A | PASS |
| Class 12 | Intercompany Interests | - | N/A | - | N/A | PASS |

[1] Insured recoveries are dependant on distributions from the Insured Trust.
[2] General Unsecured recoveries are dependant on proceeds from Causes of Action.

The exhibit below provides a detailed view of the Liquidation Analysis on a consolidated basis.

*$ in MM*

| Consolidated - Ch 7 Midpoint Gross Liquidation Proceeds | | | | | |
|---|---|---|---|---|---|
| | Notes | May '25 BS | Sept '25 PF BS | Recovery % (Base) | Recovery $ (Base) |
| **Pro Forma Adjusted Distributable Value Summary** | | | | | |
| Cash & Cash Equivalents | [1] | $ 121.5 | $ 23.6 | 100.0% | $ 23.6 |
| Restricted Cash | [2] | 22.8 | - | | - |
| AR, net | [3] | 241.5 | 172.1 | 48.5% | 83.5 |
| Intercompany AR | [4] | 5,606.9 | 5,606.9 | 0.0% | - |
| Other receivables, prepaid expenses and other current assets | [5] | 152.7 | 60.9 | 12.5% | 7.6 |
| Inventories | [6] | 39.5 | 16.2 | 24.2% | 3.9 |
| Hospital fee program receivable | [7] | 208.3 | 210.1 | 22.5% | 47.3 |
| Property, improvements and equipment, net | [8] | 371.2 | 223.7 | 17.4% | 39.0 |
| Deferred income taxes, net | [9] | 4.6 | - | | - |
| Goodwill | [10] | 132.0 | 60.0 | 0.0% | - |
| Intangible assets, net | [11] | 3.8 | 1.9 | 0.0% | - |
| Other assets | [12] | 1,316.6 | 144.0 | 9.4% | 13.5 |
| Operating Lease Right-of-Use Assets | [13] | 76.9 | 28.1 | 0.0% | - |
| Causes of Action | [14] | N/A | N/A | TBD | - |
| **Gross Distributable Value** | | $ 8,298.2 | $ 6,547.6 | | $ 218.4 |
| **Liquidation Costs** | | | | | |
| Chapter 7 Trustee Fee | [15] | | | | $ 5.8 |
| Chapter 7 Professional Fees | [16] | | | | 4.8 |
| Wind Down Costs | [17] | | | | 201.8 |
| **Net Distributable Value** | | | | | $ 6.0 |

| Claims Recovery Summary | | Claim $ | Recovery Estimate % Base | Recovery Estimate $ Base |
|---|---|---|---|---|
| **DIP Claims** | [18] | $ 313.7 | 0.9% | $ 2.8 |
| **Proceeds Available after DIP Claims** | | | | $ 3.2 |
| **Chapter 11 Administrative Claims and Priority Tax Claims** | [19] | 56.0 | 0.0% | - |
| **Proceeds Available after Ch 11 Admin Claims and Priority Tax Claims** | | | | $ 3.2 |
| **Class 1 - Other Secured Claims** | [20] | 192.5 | 0.0% | - |
| **Proceeds Available after Class 1 Claims** | | | | $ 3.2 |
| **Class 2 - Other Priority Claims** | [21] | 2.5 | 0.0% | - |
| **Proceeds Available after Class 2 Claims** | | | | $ 3.2 |
| **Class 3 - MPT Agreed Claims** | [22] | 1,146.2 | 0.0% | - |
| **Proceeds Available after Class 3 Claims** | | | | $ 3.2 |
| **Class 4 - MPT Note Claims** | [23] | 755.4 | 0.4% | 3.2 |
| **Proceeds Available after Class 4 Claims** | | | | $ - |
| **Class 5 - PhysicianCo Term Loan Claims** | [24] | 15.0 | 0.0% | - |
| **Proceeds Available after Class 5 Claims** | | | | $ - |
| **Class 6 - PGBC Secured Claims** | [25] | - | | - |
| **Proceeds Available after Class 6 Claims** | | | | $ - |
| **Class 7 - Insured Claims** | [26] | 1,283.1 | TBD | - |
| **Proceeds Available after Class 7 Claims** | | | | $ - |
| **Class 8 - General Unsecured Claims** | [27] | 3,767.2 | TBD | - |
| **Proceeds Available after Class 8 Claims** | | | | $ - |
| **Class 9 - Section 510(b) Claims** | [28] | - | | - |
| **Proceeds Available after Class 9 Claims** | | | | $ - |
| **Class 10 - Intercompany Claims** | [29] | 5,603.8 | 0.0% | - |
| **Proceeds Available after Class 10 Claims** | | | | $ - |
| **Class 11 - Existing Equity Interest Claims** | [30] | - | | - |
| **Proceeds Available after Class 11 Claims** | | | | $ - |
| **Class 12 - Intercompany Interests** | [31] | - | | - |
| **Proceeds Available after Class 12 Claims** | | | | $ - |

**Footnotes to Liquidation Analysis**

1. **Cash and Cash Equivalents**

    - Represents estimated accessible cash balances of the Debtors held in bank accounts as of the Conversion Date.
        - Estimated cash balance at HCO is $19.3 million as of the Conversion Date.
        - Estimated cash balance at PCO is $4.3 million as of the Conversion Date.
    - The Cash and Cash Equivalents are monitored on a consolidated basis as part of the weekly cash reporting. The Cash balance reflected in the Liquidation Analysis reflects the May 2025 balance rolled forward in accordance with the DIP budget to the Conversion Date and includes an additional $55.0 million of DIP proceeds expected to be advanced in August 2025 (MPT Junior DIP Facility).
    - All proceeds from sales expected to be completed prior to the Conversion Date are applied against the DIP balances.
    - The Liquidation Analysis assumes Cash and Cash Equivalents recovery will be 100% of the remaining book value.

2. **Restricted Cash**

    - Restricted cash on the Balance Sheet as of May 2025 is listed at $22.8 million, which was previously composed of two distinct balances:
        - $16.8 million at Prospect Medical Holdings, Inc. and $5.4 million at Prospect OldCo NJ, Inc. f/k/a Prospect EOGH, Inc., the Debtor's discontinued operations in New Jersey which were sold in 2021.
            - In August 2025, $16.8 million was released to the State of Rhode Island as part of earlier negotiations with the Rhode Island Attorney General to facilitate the sale of the Rhode Island Hospitals.
            - The $5.4 million of restricted cash at Prospect OldCo NJ, Inc., was held prior to the sale and was used post-sale close to settle Covid liabilities, ERP loan repayment, and Medicare cost reports. The Debtors do not believe there is any cash remaining in the escrow and expect to reflect the appropriate accounting entries on its balance sheet in advance of the Conversion Date.
    - The Restricted Cash described herein on the Debtors' Balance Sheet has been reclassified as a result of the above transactions, and the Debtors currently have $0 in Restricted Cash.
    - As a result, the Liquidation Analysis assumes a Restricted Cash recovery of 0%.

3. **Accounts Receivable, Net**

    - The Accounts Receivable ("**AR**"), Net account consists of Patient Accounts Receivable (including commercial AR, managed care AR, Medicare and Medicaid, among others) and AR due from Governmental Payers.

- All AR affiliated with the Rhode Island Hospital and PCO businesses were included in their respective sales which were completed prior to the Conversion Date.
- The Pennsylvania entity is in the process of being wound down, and the AR is expected to be largely eliminated as part of that process, with the remaining balance monetized as part of the Chapter 7 Liquidation Scenario.
- The Debtors will transition from operating to a liquidation of the California and Connecticut business shortly after the Conversion Date.
- Recovery is expected to be reduced further due to challenges caused by the abrupt liquidation and disruption to the payors.
- The Liquidation Analysis assumes proceeds from Accounts Receivable, Net is 48% to 59% of the remaining book value.

4. **Intercompany Accounts Receivable**

   - Intercompany Accounts Receivable consists of amounts owed to a Debtor entity by a) another Debtor entity or b) a Non-Debtor entity.
   - Given that recoveries on Intercompany claims are paid in Class 10 of the Plan, the recoveries in the Liquidation Analysis from Intercompany Accounts Receivable are expected to be 0% of the remaining book value.

5. **Other Receivables, Prepaid Expenses and Other Current Assets**

   - Other Receivables, Prepaid Expenses and Other Current Assets consist primarily of prepaid expenses (taxes, malpractice receivables, insurance, information technology), with capitation receivables, risk pool receivables, grants receivable, and certain Other Assets also contributing.
   - Recoveries on Prepaid Expenses are expected to be minimal (5-10%), while the remaining assets are expected to recover in the 35-50% range.
   - The Liquidation Analysis assumes proceeds from Other Receivables, Prepaid Expenses and Other Current Assets are 12% to 20% of the remaining book value.

6. **Inventories, Net**

   - Inventories, Net consists of several types of Inventories used by the Debtor including, centralized supplies, pharmacy inventory, general store inventory and hospital inventory.
   - All Inventory associated with the Rhode Island and PhysicianCo Sales were included in the respective transactions.
   - All inventory remaining in Pennsylvania after the wind-down was written-off as part of the Hospital closures.
   - At the Conversion Date, the remaining Inventory totaling $16.2 million is located in the California and Connecticut hospitals.
   - The Chapter 7 Liquidation Scenario assumes liquidation proceeds from Inventories, Net are 24% to 30% of the remaining book value.

7. **Hospital Fee Program Receivable**

   - Hospital Fee Program Receivable primarily includes governmental program receivables in California associated with the Quality Assurance Fee program ("**QAF**").
   - The estimated $240.0 million receivable balance is assumed to be offset by a $160.3 million liability.
   - It is assumed that the payors affiliated with the program will seek to offset their liabilities against the balances owed to the Debtor which will lower the recovery on the gross receivable balance.
   - The Chapter 7 Liquidation Scenario assumes proceeds from the Hospital Fee Program Receivables are 22% to 25% of the remaining book value.

8. **Property, Improvements and Equipment, Net**

   - Property, Improvements and Equipment, Net ("**PP&E**") includes buildings, leasehold improvements, IT software and hardware, and furniture and fixtures, equipment, land, etc.
   - All PP&E associated with the Rhode Island and PhysicianCo sales were included in the transaction.
   - All PP&E of value in Pennsylvania was sold during the wind-down and the remainder was written-off as part of the Hospital closures.
   - At the Conversion Date, the remaining PP&E totaling $223.7 million is located in the California and Connecticut region, which are being liquidated. The largest portion of this balance ($130.8 million) is related to the buildings sold to MPT and leased back in those regions. To remain consistent with the terms of the 9019 settlement, it is assumed that the California and Connecticut hospitals are sold in a liquidation with an estimates recovery of 22% to 25%.
   - The remaining balance in California is related to IT and Furniture and fixtures which are expected to recover in the 8 to 20% range.
   - The Chapter 7 Liquidation scenario assumes liquidation proceeds from Property, Improvements and Equipment, Net are 17% to 20% of the remaining book value.

9. **Deferred Income Taxes, Net**

   - Deferred Income Taxes, Net represents the tax consequences of temporary differences between a company's accounting income (reported in financial statements) and its taxable income (reported to tax authorities)
   - Prior to 2020, balances existed at each entity as reflected on the balance sheet at the time. In 2020 an entry was posted to consolidate the balance at the corporate entity level but never pushed down to the entity level.
   - The Debtors intend to eliminate the balances in advance of the Conversion Date.
   - The Chapter 7 Liquidation Scenario is estimated to recover 0% from Deferred Income Taxes, Net.

**10. Goodwill**

- Goodwill represents the value of acquired assets above the value of acquired tangible assets and identified liabilities.
- Goodwill is recorded within the California, Connecticut and Pennsylvania markets.
- All Goodwill affiliated with Pennsylvania will be eliminated prior to the Conversion Date as a result of its wind-down.
- California Goodwill is related to the original acquisition of the Alta Hospitals (1998) and the Culver City Hospitals (2012).
- Connecticut Goodwill is related to various practice acquisitions in the Connecticut market between 2018-2023.
- The Chapter 7 Liquidation scenario is estimated to recover 0% on account of Goodwill.

**11. Intangible Assets, Net**

- Intangible Assets, Net balances exist in California, Connecticut, and Pennsylvania.
- Pennsylvania intangibles are being eliminated prior to the Conversion Date as a result of its wind-down.
- California intangible balances relate to the Incorporation of the Hospital System in 1998.
- Connecticut intangibles relates to its trade name.
- The Chapter 7 Liquidation Scenario is estimated to recover 0% from Intangible Assets, Net.

**12. Other Assets**

- Other Assets consist of investments in subsidiaries, investments in partnerships, long-term prepaid assets, long-term deposits, long-term notes receivable, and other assets.
- Investments in subsidiaries and partnerships account for 90% of the balance at the Conversion Date. These investments along with all the Debtors' assets have been marketed for Sale and all saleable assets were included in the various sales in advance of the Conversion Date. It is not believed that any additional recovery will accrue from these assets in a liquidation.
- Other assets (long-term deposits and other assets) have a minimal recovery (15-20%.
- The Chapter 7 Liquidation Scenario assumes liquidation proceeds from the Other Assets are 9% to 13% of the remaining book value.

**13. Operating Lease Right-of-Use Assets**

- "**Operating Lease Right-of-Use Assets**" is an accounting convention estimating the value of the Debtors privilege to utilize a leased asset over the lease term.
- This asset reflects the lessee's right to occupy, operate, or hold the leased asset, but ownership remains with the lessor.
- There is a similar liability offsetting the asset on the balance sheet.

- Under a Chapter 7 Liquidation Scenario, the Debtors assume all operating leases would be rejected.
- The Chapter 7 Liquidation Scenario assumes liquidation proceeds from the Operating Lease Right-of-Use Assets are 0% of the remaining book value.

**14. Causes of Action**

- Estate Causes of Action recovery includes any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the HCo Petition Date (as defined in the Disclosure Statement), in contract, tort, law, equity, or otherwise.
- The Debtors are continuing their investigation and analysis of the Estate Causes of Action. At present, the Debtors lack sufficient information to determine, with reasonable certainty, the likelihood of success or the potential range of recoveries, if any, that may be realized from the prosecution, settlement, or other resolution of such causes of action. Accordingly, no value has been assigned to the Estate Causes of Action in this Liquidation Analysis at this time. The omission of any value at this time does not constitute, and shall not be construed as, a waiver, release, or abandonment of any such causes of action, all of which are expressly preserved. Actual recoveries, if any, may differ materially from any estimates that may be developed at a later date.

**15. Chapter 7 Trustee Fee**

- The Chapter 7 Trustee will be appointed to ensure the orderly wind-down of the Debtors' Estate in the Chapter 7 Liquidation Scenario.
- Duties include, but not limited to, monetizing remaining assets, reconciling claims, winding down legal entities, pursuing causes of action, and making distributions to claimants.
- Expenses for a Chapter 7 Trustee are assumed to be three percent (3%) of all gross liquidation proceeds (excluding beginning cash & cash equivalents) in the case.

**16. Chapter 7 Professional Fees**

- The Chapter 7 Trustee will require professionals to assist in the orderly wind-down of the company in the Chapter 7 Liquidation Scenario.
- The budget includes $4.8 million]for the Chapter 7 Trustee's professionals to assist in the wind-down of the business (includes counsel, financial advisors and claims agents).

**17. Wind-Down Costs**

- Wind-Down costs include:
    i) Expenses related to winding down the operations of the Debtors after the Conversion Date.
        - Expenses include: (a) the cost of employees retained to assist in the wind-down, (b) tax costs to complete all necessary tax returns, (c) costs required to maintain systems during the wind-down, and (d) costs to dissolve the entities.
        - Estimated cost is $14.8 million.
    ii) Wind-Down budget for the orderly wind-down of health care practices discontinued at the Conversion Date (Connecticut & California) and for entities currently being wound down (Pennsylvania and PCO).
        - Expenses include: (a) payroll & benefits for employees during the wind-down period, (b) operating costs, (c) rent payments during wind-down, (d) record storage costs, and (e) other wind-down costs.
        - Estimated costs $187.1 million (CA $99.0 million; CT $85.3 million; PA $1.8 million; PCO $0.9 million)
- Total estimated net budget for wind-down costs are $201.8 million.

**18. DIP Claims**

- DIP Claims include, collectively, the i) eCapital DIP ABL Claim, ii) the MPT Junior DIP Claim.

    i) Claims related to the eCapital DIP ABL Facility are approximately $85.0 million. The Prepetition ABL claims for the California business were rolled up as part of the DIP Order. Recoveries are paid 100% out of proceeds from the California liquidation (if available). Projected recoveries on account of the eCapital DIP ABL Claims are estimated to be 1% to 27%.

    ii) Claims related to the MPT Junior DIP Facility totaling $228.7 million in super-priority post-petition financing in accordance with the Junior DIP Credit Agreement, Junior DIP Documents, and Junior DIP Orders. The MPT Junior DIP Claims include:
        - $25.0 million in new money provided by MPT plus fees and expenses. The New money is made up of i) $13.5 million in DIP funds and ii) $11.5 million in funds for Seismic upgrades to the California facilities plus fees and interest. At the time of the conversion, it is anticipated that the Debtors are holding certain DIP funds related to the seismic upgrades in their bank accounts. It is assumed that the unused funds are returned to MPT and used to pay down the MPT Junior DIP claim. Estimated remaining balance at the Conversion Date is $19.9 million. Projected recoveries on account of the MPT Junior DIP Claims are estimated to be 0% to 8%.
        - $43.4 million in MPT adequate protection claims. This is based on a $5.0 million monthly Junior DIP accrual (as a partial substitute for current cash

payment of rent or interest). The adequate protection was approved as part of the JMB DIP Facility, and the accrual covers January 11, 2025, through the Conversion Date. Projected recoveries on account of the MPT Adequate Protection Claims are estimated to be 0% to 8%.
- $80.0 million in additional MPT Junior DIP Claims was drawn in August 2025 to fund operations through the plan confirmation date. Projected recoveries on account of the Additional MPT DIP Claims are estimated to be 0% to 8%.
- $85.4 million in MPT term loan roll-up claims. The 9019 Global settlement allows for up to $50 million to be rolled up and settled alongside the MPT Junior DIP Claims. The remaining $35.6 million balance is rolled up and settled at the same time as the CT Provider Taxes. Projected recoveries on account of the MPT Term Loan Rollup Claims are estimated to be 0% to 5%.

**19. Chapter 11 Administrative Claims and Priority Tax Claims**

- Administrative Claims include Claim of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating Debtors' business; (b) Allowed Professional Compensation Claims; (c) Statutory Fees; and (d) 503(b)(9) Claims; and (e) all other Claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court.
  - Administrative claims include: (i) unpaid 503(b)(9) claims, (ii) accrued post-petition AP claims, (iii) administrative PTO/401K, (iv) accrued and unpaid professional fees as of the Conversion Date, and (v) Statutory Fees owed to the US Trustee.
- Priority Tax Claim includes any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.
  - Priority Tax Claims include: (i) federal and state taxes, (ii) personal property taxes, and (iii) priority PTO/401K.
- Projected recoveries on account of the Chapter 11 Administrative Claims and Priority Tax Claims are estimated to be 0%.

**20. Class 1 – Other Secured Claims**

- Class 1 – Other Secured Claims includes any Secured Claim, other than a DIP Claim, a PhysicianCo Term Loan Claim, a Prepetition ABL Claim, an MPT Note Claim, or an MPT Agreed Claim.
- Connecticut Provider Tax Claims are estimated to be $169.9 million. Estimated recovery (if any) based on 9019 settlement, paid only up to the value of proceeds of collateral on which CT has a senior priority lien. Due to the low recoveries and high wind down costs in, there is no anticipated recovery for the CT Provider Tax Claims.
- Other Secured Claims excluding the CT Provider Taxes are estimated to total $22.6 million.

- Projected recoveries on account of Class 1 – Other Secured Claims are estimated to be 0%.

**21. Class 2 – Other Priority Claims**

- Class 2 – Other Priority Claims includes any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.
- Other Priority Claims are estimated to total $2.5 million. Projected recoveries on account of Class 2 – Other Priority Claims are estimated to be 0%.

**22. Class 3 – MPT Agreed Claims**

- Class 3 – MPT Agreed Claims includes both i) MPT Senior Agreed Claims and ii) MPT Junior Agreed Claims.

    i) "**MPT Senior Agreed Claims**" includes, collectively: (a) MPT Mortgage Loan Claims in the amount of $155,222,518 in principal plus $12,513,819.83 in accrued and unpaid interest, fees and other amounts; (b) MPT Master Lease Claims in the amount of $75,496,030.20; (c) $400,000 of additional actual out-of-pocket unreimbursed expenditures for which MPT is owed reimbursement pursuant to the agreements underlying clauses (a) and (b) that are not accounted for in clauses (a) and (b); and (d) interest on clauses (a)–(c) accruing at a rate equal to 9.00% per annum and other fees, interest, expenses, and other accruals in respect of clauses (a)–(c) (including interest accruing on the MPT Mortgage Loans and ongoing accruals of rent under the MPT Master Lease Agreements), less the aggregate amount of Accrued Loans. Projected recoveries on account of the MPT Senior Agreed Claims are estimated to be 0%.

    ii) "**MPT Junior Agreed Claims**" includes, collectively: (a) MPT Master Lease Claims in the amount of $868,618,295 in respect of the lease base and accruals in respect thereof (other than the accrual that comprise the Accrued Loans) that are not otherwise included as MPT Senior Agreed Claims; and (b) any MPT Deficiency Claim not otherwise paid pursuant to the Recovery Waterfall or this Plan, which for the purposes of this definition shall be granted the same treatment as a General Unsecured Claim under [Article III] of this Plan. Projected recoveries on account of the MPT Junior Agreed Claims are estimated to be 0%.

**23. Class 4 – MPT Note Claims**

- Class 4 - MPT Note Claims means any Claim arising under or relating to the MPT Convertible Notes.
- The MPT Note Claims shall be Allowed in the aggregate amount of $755,353,205.89 and will be paid using its pro rata share of PCo Asset proceeds.
- Projected recoveries on account of the MPT Note Claims are estimated to be 0% to 1%.

**24. Class 5 – PhysicianCo Subordinated Secured Note Claims**

- Class 5 – PhysicianCo Subordinated Secured Note Claims means any claims arising under that certain Subordinated Secured Promissory Note, dated July 1, 2025, by and among PhysicianCo and the holders thereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).
- The PhysicianCo Subordinated Secured Note Claims shall be Allowed in the aggregate amount of $15,033,997.04 and will be paid using its pro rata share of PCo Asset proceeds.
- Projected recoveries on account of the PhysicianCo Subordinated Secured Note Claims are estimated to be 0%.

**25. Class 6 – PBGC Secured Claims**

- Class 6 - PBGC Secured Claim includes the Secured Claim held by the PBGC against the Debtors in the amount of $23,733,992, plus accrued and unpaid amounts of any adequate protection due and owing through the Conversion Date to the PBGC under paragraph 12 of the 9019 Order, which shall be reduced on a dollar-for-dollar basis by (x) payments pursuant to paragraph 63 of the 9019 Settlement Order and (y) any other payments of the PBGC Secured Claim.
- The PBGC Secured Claim was paid in full from the proceeds from the Rhode Island PhysicianCo Sale transaction.
- There are no remaining claims related to the PBGC Secured Claims.

**26. Class 7 – Insured Claims**

- Class 7 - Insured Claim includes any Claim that arises from personal injury, medical malpractice, or wrongful death and that is covered by the terms of one or more Insurance Policies, or for which a Debtor is entitled to indemnification, reimbursement, contribution, or other payment under one or more Insurance Policies; *provided*, *however*, that all Claims for any deductible or self-insured retention obligations of the Debtors shall be treated as General Unsecured Claims (to the extent Allowed) subject to Article [III.B.6.b] herein.
- The Liquidation Analysis does not reflect any proceeds / recovery from Insurance or associated payments to Insured Claims from the payments.
- Filed Insured Claims total $1,283.0 million; provided that all or substantially all of the Filed Insured Claims are disputed and/or unliquidated.
- Recoveries to Holders of Allowed Insured Claims are dependent on a number of issues. First, a Holder's recovery depends on whether such Holder elects to receive a distribution from the Insurance Trust or to liquidate their Insured Claim against the Debtors to recover from applicable insurance. Second, the quantum of Insurance Trust Assets that can be distributed to Holders of Allowed Insured Claims that elect to receive a distribution from the Insurance is uncertain because the Debtors are still negotiating with its Insurers to reach a settlement, sale or other transaction. At present, the Debtors lack sufficient information to determine, with reasonable certainty, the amounts, if any,

will be contributed to the Insurance Trust or how much an individual claimant would recover if they did not elect to particulate in the Insurance Trust
- Projected recoveries on account of the Insured Claims are TBD.

## 27. Class 8 – General Unsecured Claims

- Class 8 - General Unsecured Claim includes any Claim that is not an Administrative Claim (including a Professional Compensation Claim), a DIP Claim, a PBGC Secured Claim, a Priority Tax Claim, an Other Secured Claim, an Other Priority Claim, a Prepetition ABL Claim, an MPT Agreed Claim, an MPT Note Claim, a PhysicianCo Subordinated Note Claim, a Section 510(b) Claim, or an Intercompany Claim.
- The Liquidation Scenario does not contemplate recoveries from Causes of Action, which accrue for the benefit of General Unsecured Claims as described in footnote 14.
- Based on the review of the filed claims, total estimated General Unsecured Claims are $3,767.2 million.
- Projected recoveries on account of the General Unsecured Claims are TBD.

## 28. Class 9 - Section 510(b) Claims

- Class 9 - Section 510(b) Claims include any Claim against any Debtor that is subject to subordination pursuant to section 510(b) of the Bankruptcy Code, whether by operation of Law or contract.
- There are no known claims in this class.

## 29. Class 10 - Intercompany Claims

- Class 10 Intercompany Claims include any Claim held by a Debtor against another Debtor.
- Total estimated Intercompany Claims are $5,603.8 million.
- Projected recoveries on account of the Intercompany Claims are estimated to be 0%.

## 30. Class 11 - Existing Equity Interests

- Class 11 – Existing Equity Interests include an Interest in a Debtor existing as of the Effective Date.
- Projected recoveries on account of the Existing Equity Interests are estimated to be 0%.

## 31. Class 12 – Intercompany Interests

- Class 12 – Intercompany Interests include any all interests of any Debtor in any other Debtor.
- Projected recoveries on account of the Intercompany Interests are estimated to be 0%.